FILED

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2014 APR 16  A 10: 29

CLERK US DISTRICT COURT
ALEXANDRIA. VIRGINIA

| | |
|---|---|
| **JOHN OSWALD,** ) | |
| ) | |
| **Plaintiff,** ) | Civil Action No: *1:14cv404* |
| **v.** ) | *(GBL/TRJ)* |
| ) | |
| **LEOPOLD BALESTRIERI,** ) | |
| ) | |
| **KATHARINE MARIE SHEEHAN,** ) | |
| ) | |
| **EDIE BALESTRIERI,** ) | |
| ) | |
| **BAR ITALIA, LLC,** ) | |
| ) | |
| **TATE HOLDING, INC.,** ) | |
| ) | |
| **AMERICAN PIE, LLC,** ) | |
| ) | |
| **APICIUS RISTORANTE e** ) | |
| **ENOTECA LLC,** ) | |
| ) | |
| **DOES 1-15, inclusive,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff John Oswald brings this action against defendants Leopold Balestieri, Katharine Marie Sheehan, Edie Balestrieri (hereinafter, "E. Balestrieri"), Bar Italia, LLC, Tate Holding, Inc., Apicius Ristorante e Enoteca, LLC, and Does 1-15, inclusive, jointly and severally, for breach of contract, fraudulent misrepresentations, false and fraudulent personification of an officer or employee of the United States, false and fraudulent personification of a federally insured bank official, conversion, conspiracy to defraud, wire fraud, violation of the Racketeer Influenced and Corruption Organizations Act [hereinafter, "RICO"] 18 U.S.C. § 1861 *et seq.*, and for gross/willful and wanton negligence. In addition, this suit seeks declaratory relief as to

the rights of the parties with regard to American Pie, LLC, to Tate Holding, Inc., to Apicius, Ristorante e Enoteca, LLC, and to Bar Italia, LLC.

## JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, federal question, and 28 U. S. C. § 1332, diversity of citizenship, 18 U. S. C. § 1964 (c), RICO jurisdiction, and 28 U. S. C. § 1367, supplemental jurisdiction.

## VENUE

2.     Venue is appropriate in this district under 28 U.S.C. § 1391(b).

## PARTIES

3.     Plaintiff John Oswald [hereinafter,"Oswald"] is, and at all times herein mentioned was, a resident of the Eastern District of Virginia.

4.     Defendant Leopold Balestrieri [hereinafter, "L. Balestrieri"] is, and at all times herein mentioned was, an individual who held himself out as a trained chef, an owner of restaurants, a real estate developer, the owner of the restaurants known as Apicius Ristorante e Enoteca and Bar Italia and the owner of Defendant Tate Holding Inc. Defendant L. Balestrieri is the owner and an officer of Defendant Tate Holding, Inc.  Defendant L. Balestrieri has represented himself as a resident of the State of Florida, the State of New York, and other places.

5.     Defendant Katharine Marie Sheehan is, and at all times herein mentioned was, an individual and Defendant L. Balestrieri's partner and associate.  Defendant Sheehan is an officer and the registered agent of Defendant Tate Holding, Inc.  Sheehan has represented herself as a resident of the State of Florida, the State of New York, and other places.

6.     Defendant Tate Holding, Inc. is a Florida corporation, with two officers: Defendant Sheehan and Defendant Balestrieri.

7.      Defendant Apicius Ristorante e Enoteca, LLC, is, and at all times herein mentioned was, a Florida limited liability company, which operated the restaurant called Apicius Ristorante e Enoteca in Lantana, Florida. The Managing Members or Managers of Defendant Apicius Ristorante e Enoteca, LLC, are Defendants Balestrieri, Sheehan, and Tate Holding, Inc.

8.      Defendant American Pie, LLC, is, and at all times herein mentioned was, a Florida limited liability company, which Plaintiff Oswald is informed and believes and thereon alleges, that Defendant Balestrieri formed. The managing member of said limited liability company is Tate Holding, Inc.

9.      Defendant Edie Balestrieri ("E. Balestrieri") is, and at all times herein mentioned was, Defendant Balestrieri's wife. Defendant E. Balestrieri aided the other defendants and each of them, and or participated with the other defendants and each of them, in the conduct described herein. Defendant E. Balestrieri and Defendant Tate Holding, Inc., are identified as the managing members of Bar Italia, LLD. Defendant E. Balestrieri has represented herself as a resident of the State of New York, the State of Florida, and the State of North Carolina.

10.     Defendant Bar Italia, LLC, is a Florida limited liability company, which owned and operated Bar Italia, a bar and restaurant located at 210 E. Ocean Avenue, Lantana, Florida.

11.     Doe 1 is an individual who may or may not exist. Doe 1 was represented by Defendants, and each of them, to be a person by the name of "David McManis", a Revenue Officer with the Internal Revenue Service. "David McManis" is not a revenue officer with the Internal Revenue Service; he is either a person pretending to be such or a complete fabrication by Defendants. Email messages were sent to Plaintiff Oswald purportedly from "David McManus, Revenue Officer, Internal Revenue Service".

12.     Doe 2 is an individual who may or may not exist. Doe 2 was represented by Defendants, and each of them, to be a person by the name of "Ghazela Ahmed", a bank official with Wells Fargo Bank in Charlotte, North Carolina. "Ghazela Ahmed", is not a bank official with Wells Fargo Bank in Charlotte, North Carolina; she is either a person pretending to be such or a complete fabrication by Defendants. Email messages were sent to Plaintiff Oswald purportedly from "Ghazela Ahmed" of Wells Fargo Bank.

13.     Doe 3 is an individual who may or may not exist. Doe 3 was represented by Defendants, and each of them, to be a person by the name of "Wayne Cahill", an accountant. "Wayne Cahill", is not an accountant; he is either a person pretending to be such or a complete fabrication by Defendants. Email messages were sent to Plaintiff Oswald purportedly from "Wayne Cahill".

14.     Doe 4 is an individual who may or may not exist. Doe 4 was represented by Defendants, and each of them, to be a person by the name of "Frank Roccoa", a Florida attorney. The Florida State Bar has no attorney named "Frank Roccoa". "Frank Roccoa" is either a person pretending to be such or a complete fabrication by Defendants. Email messages were sent to Plaintiff Oswald purportedly from "Frank Roccoa".

15.     Doe 5 is an individual who may or may not exist. Doe 5 was represented by Defendant Balestrieri to be a person by the name of "Joseph Scarpelli", president of the Scarpelli Group, LLC, a New York limited liability company. "Joseph Scarpelli" is either a person pretending to be such or a complete fabrication by Defendant Balestrieri. The "Scarpelli Group, LLC", is a fictitious company which does not exist. At Defendant Balestrieri's instruction, Plaintiff Oswald sent email messages to an email address purported to be that of "Joseph Scarpelli". Email messages were sent to Plaintiff Oswald purportedly from "Joseph Scarpelli".

16.    Does 6-15, inclusive, were other persons or entities that were involved in the conduct described herein. At all times described herein, Does 6-15, inclusive, acted both inside and outside the scope of their employment.

17.    Defendants, and each of them, acted as agents and/or employees of each other and/or the acts described herein were ratified by defendants and each of them. Defendants, and each of them, conspired and/or schemed with the other defendants, and each of them, to defraud Plaintiff John Oswald, as described herein, and at no time did any Defendant withdraw from said conspiracy and/or scheme.

## I.    FACTS

18.    Beginning in or about October 2010, Plaintiff Oswald began to visit Apicius Ristorante E Enoteca [hereinafter, "Apicius"] in Lantana, Florida.

19.    During these visits, Plaintiff Oswald met the owner/chef, Defendant Balestrieri, who had developed a reputation for providing excellent food, and who demonstrated a unique rapport with his diners. Apicius was the place to go because of Defendant Balestrieri.

20.    During these visits, Defendant Balestrieri introduced Plaintiff Oswald to Defendant Sheehan and there were discussions of potential business opportunities.

21.    In or about November, 2010, Defendant Balestrieri and Defendant Sheehan proposed and offered the following business transaction to Plaintiff Oswald:

a.    Defendant Balestrieri and Defendant Sheehan together with Plaintiff Oswald would purchase a restaurant business in the name of American Pie, LLC. Plaintiff Oswald would own half of the LLC and Defendant Balestrieri and Defendant Sheehan would own the other half.

b.     Plaintiff Oswald would loan or advance or contribute money to fund American Pie, LLC.

c.     The purpose of the new company would be to engage in the restaurant business in the State of Florida and activities incident thereto, and specifically included the purchase, renovation and reopening of a restaurant in Lantana, Florida, known as Suite 225, that had been closed.

22.     On or about February, 8, 2011, Defendants, and each of them, sent Plaintiff Oswald an Operating Agreement for American Pie, LLC, which was represented to have been signed by Defendant Balestrieri. Plaintiff Oswald signed the agreement. The parties to the Agreement were Defendant Balistieri and Defendant Tate Holding, Inc. on the one hand, and Plaintiff Oswald and Bridge East Management, LLC, a Delaware limited liability company, on the other hand. [Exhibits 1A, 1B.[1]]

23.     The Operating Agreement identified Defendant Balestrieri and Plaintiff Oswald as the two designated members of American Pie, LLC, and identified Defendant Balestrieri as the managing member, who had the duties and responsibilities of conducting the day-to-day operations of American Pie, LLC.

24.     The Operating Agreement required Defendant Balestrieri and Plaintiff Oswald to each make an initial capital contribution of $250,000 to the account of American Pie, LLC in order to conduct business, and such additional capital contributions as agreed upon by the Members.

25.     After the signing of the Operating Agreement, Defendants, and each of them, made constant and repeated demands for more funding for American Pie, LLC and for the

---

[1] All Exhibits in this Complaint are **incorporated herein *in haec verba.***

purchase and renovation of the new restaurant. Defendants, and each of them, intended that Plaintiff Oswald would rely on their representations regarding the need for additional funding and Plaintiff Oswald did justifiably rely on their representations.

26.     In reliance upon these representations, Plaintiff Oswald transferred funds, as listed in paragraphs below, from his account at UBS Financial Services of McLean, Virginia, to the account of American Pie, LLC, at Wachovia Bank, Palm Beach, Florida.

27.     On February 18, 2011, Plaintiff Oswald transferred by wire $100,000.00, from his account at UBS, in Virginia, to  the American Pie, LLC, account  at the Wachovia Bank,  Palm Beach, Florida, for the purchase of the Suite 225 business including the lease for the premises, and for the renovation of the Suite 225 premises.  [1st American Pie transfer.]

28.     On March 31, 2011, Plaintiff Oswald transferred by wire $100,000.00, from his account at UBS, in Virginia, to the American Pie, LLC,  account  at the Wachovia Bank, Palm Beach, Florida, for the purchase of the Suite 225 business including the lease for the premises, and for the renovation of the Suite 225 premises.  [2nd American Pie transfer.]

29.     On May 14, 2011, Defendants, and each of them, sent Plaintiff Oswald a spreadsheet listing expenses related to the Suite 225 transaction, which said defendants claimed had been paid on behalf of American Pie, LLC, from the funds provided by Plaintiff Oswald. [Exhibits 2A, 2B.]

30.     On May 26, 2011, Plaintiff Oswald transferred by wire $75,000, from his account at UBS, in Virginia, to the American Pie, LLC,  account  at Wachovia Bank, Palm Beach, Florida, for the purchase of the Suite 225 business including the lease for the premises, and for the renovation of Suite 225.  [3rd American Pie transfer.]

31.     On or before June 9, 2011, Defendants, and each of them, closed the restaurant Apicius Ristorante e Enoteca, and on June 10, 2011, reopened a restaurant called Bar Italia in the same space as the former Apicius.  Bar Italia was owned by Bar Italia, LLC. The Managing Members of Bar Italia, LLC, are listed as Defendant Tate Holding, Inc., and Defendant E. Balestrieri.

32.     On June 16, 2011, Defendants, and each of them, advised Plaintiff Oswald in an email communication that Defendants had reached an agreement with the tenant and the owner of the Suite 225 premises; and, that the purchase of the Suite 225 business by American Pie, LLC, had been completed.  Said Defendants attached an Agreement For Purchase and Sale for Plaintiff Oswald to sign. [Exhibits 3A, 3B.]

33.     On June 17, 2011, said Defendants sent Plaintiff Oswald an email communication with an attached American Pie budget. Said Defendants represented in this communication that Suite 225 construction would begin in two days, and instructed Plaintiff Oswald to transfer an additional $50,000 to the American Pie, LLC, account. [Exhibits 4A, 4B.]

34.     On June 29, 2011, Plaintiff Oswald transferred by wire $50,000, from his account at UBS, Virginia, to the American Pie, LLC, account  at Wachovia Bank, Palm Beach, Florida, for the purchase of the Suite 225 business including the lease for the premises, and for the renovation of Suite 225.  [4th American Pie transfer.]

35.     Despite the foregoing representations to Plaintiff Oswald, Defendants, and each of, them, never completed the purchase of the Suite 225 business, never took possession of the Suite 225 premises, and never performed any renovations on that premises.

36.     Thereafter, Defendants, and each of them, embezzled the monies that had been provided by Plaintiff Oswald and/or converted said monies to their own use.

37.     After embezzling and /or converting and/or misappropriating Plaintiff Oswald's money; and defrauding Plaintiff Oswald, Defendants, and each of them, advised Plaintiff Oswald that the purchase of the Suite 225 restaurant business could not be completed due to a dispute between the seller of the Suite 225 business and the owner of the premises.

38.     Defendants, and each of them, in order to continue their conspiracy and/or scheme to defraud Plaintiff Oswald, proposed to Plaintiff Oswald that he join with said Defendants in a business venture to purchase very good wines at very low prices, which said Defendants stated they could resell at significantly marked-up prices. Thereafter, in order to implement the wine scheme, and to conceal and to continue their prior fraudulent scheme, said Defendants represented they had used a portion of Plaintiff Oswald's previous contributions of money to American Pie, LLC, as set forth above, to purchase a quantity of wine for American Pie, LLC, to use for the Suite 225 restaurant when it opened.

39.     In order to keep Plaintiff Oswald's money  and conceal that Defendants had converted said money to their personal use, Defendants, and each of them, represented that they would continue to purchase large quantities of very good wine at wholesale prices, and would resell this wine at significantly marked-up prices; and, said Defendants further represented that they had reallocated certain amounts of Plaintiff Oswald's money from American Pie, LLC, to Defendant Tate Holding, Inc., in order to fund said Defendants' new undertaking, which said Defendants dubbed the "wholesale wine venture". **[Exhibits 5A, 5B, 5C.]**

40.     At the time, Defendant Balestrieri had a large wine collection and had demonstrated to Plaintiff Oswald a facility to recognize and to obtain fine wine.

41.     Defendants, and each of them, instructed Plaintiff Oswald that the Defendants' side of the "wholesale wine venture" would be conducted in the name of Defendant Tate

Holding, Inc., and that Plaintiff Oswald would have a 50% interest in the wholesale wine venture. Defendants, and each of them, represented that the wine would be sold at wholesale prices to other restaurants and wine and spirit stores; and sold at retail prices from Bar Italia.

42.     Defendants, and each of them, instructed Plaintiff Oswald to transfer additional funds to an account in the name of Defendant Tate Holding, Inc. at a Wells Fargo bank, as set forth herein, in order to purchase an interest in the wholesale wine venture and to fund the purchase of additional wine for this venture.

43.     On September 6, 2011, in reliance upon the representations of Defendants, and each of them, regarding the wholesale wine venture, Plaintiff Oswald transferred by wire from his account at UBS Financial Services, Vienna VA, $65,000 to the account of Tate Holding, Inc., at Wells Fargo Bank, as further payment for his share in the wholesale wine venture. [1st Tate transfer.]

44.     On September 13, 2011, Defendant Balestrieri represented to Plaintiff Oswald that they had purchased the wine, that the expected profit from the sale of this wine is $700,000 to $900,000 over the next six to eight months, and that 4090 bottles of the wine had been sold and delivered as of September 12, 2011, and that payment would be received within 21 days. [Exhibits 5B, 5C.]

45.     On September 15, 2011, in reliance upon the foregoing representations of Defendants, and each of them, Plaintiff Oswald transferred from his account at UBS Financial Services, Vienna, Virginia, $50,000 to the account of Tate Holding, Inc., at Wells Fargo Bank as further payment for his share in the wholesale wine venture. [2nd Tate transfer.]

46.     During this period of time, Defendants, and each of them, in order to conceal and further implement their fraudulent schemes, proposed to sell to Plaintiff Oswald, for the sum of

$500,000.00, one-half interest in Apicius Ristorante e Enoteca, LLC, (d/b/a Bar Italia). Defendants further represented and promised that Plaintiff Oswald's one-half interest would include one-half of all assets, one-half of the liquor license, one-half of the wine inventory, and one-half of the profits of Apicius. Plaintiff Oswald agreed to and did purchase this interest.

47.     On or about October 31, 2011, Defendants, and each of them, represented that they had negotiated a Letter of Intent between a person identified as Luigi Silvestri of LSMS, Inc., and Tate Holding, Inc., which provided that Silvestri and LSMS would purchase 100% of Apicius Ristorante e Enoteca, LLC for $1,500,000.00. Defendants also represented that Mr. Silvestri had signed the Letter of Intent. [Exhibits 7A, 7B.]

48.     Defendants, and each of them, represented to Plaintiff Oswald that Apicius needed to be operable in order to complete the aforementioned sale; and instructed Plaintiff Oswald to send additional funds to Tate Holding, Inc., for the purchase of his one-half interest in Apicius Ristorante e Enoteca, LLC.

49.     On November 1, 2011, defendants, and each of them, provided a proposed breakdown of expenses and a proposed distribution of proceeds, both prior to and after the closing of the sale of Apicius Ristorante e Enoteca, LLC (d/b/a Bar Italia), to Mr. Silvestri and LSMS. [Exhibits 8A, 8B.]

50.     On November 2, 2011, defendants, and each of them, in order to continue, to conceal, and to further implement, their fraudulent schemes, sent to Plaintiff Oswald an email communication and an attached spreadsheet, which represented that said Defendants had allocated a portion of Plaintiff's prior contributions to the failed American Pie, LLC/Suite 225 transaction to the wholesale wine venture, and had allocated the remaining portion of these prior contributions to Plaintiff's purchase of one-half interest in Apicius Ristorante e Enoteca, LLC

(d/b/a Bar Italia), for the purchase price of $500,000.00, which sale included one-half interest in all assets, one-half interest in the liquor license, one-half interest in the wine inventory, and one-half interest in the profits of Apicius. The remainder of this purchase price was to be paid in cash by Plaintiff to the account of Defendant Tate Holding, Inc. **[Exhibits 8C, 8D.]**

51.    On or about November 5, 2011, Defendants, and each of them, sent to Plaintiff Oswald an agreement, which confirmed the sale by Defendants, and each of them, to Plaintiff Oswald, of a one-half interest in Apicius Ristorante e Enoteca, LLC (d/b/a Bar Italia), for the sum of $500,000.00, which sale included one-half interest in all assets, one-half interest in the liquor license, one-half interest in the wine inventory, and one-half interest in the profits of Apicius until the sale to Silvestri and LSMS closed. **[Exhibit 9A, 9B.]**

52.    On November 9, 2011, Defendants, and each of them, sent Plaintiff Oswald a spreadsheet regarding the purported wholesale wine venture in which said Defendants represented that they had sold certain wine, and that certain other wine remained in their possession for sale and further stated the value of said wine, and the profits earned or to be earned. **[Exhibit 10A, 10B.]**

53.    On November 10 and 21, 2011, Defendants, and each of them, instructed Plaintiff Oswald to wire transfer additional money to the account of Defendant Tate Holding, Inc., at Wells Fargo bank. **[Exhibit 11A, 11B.]**

54.    On November 21, 2011, in reliance upon the foregoing representations of Defendants, and each of them, Plaintiff Oswald transferred from his account at UBS Financial Services, Vienna, Virginia, $20,000 to the account of Tate Holding, Inc., at Wells Fargo Bank. **[3rd Tate transfer.]**

55.    On November 29, 2011, Defendants, and each of them, in two email communications, confirmed that they had sold Plaintiff Oswald 50% of interest of Defendant Tate Holding, Inc., in Apicius Ristorante e Enoteca, LLC, (d/b/a Bar Italia), represented how said Defendants had allocated Plaintiff Oswald's contributions to date, instructed Plaintiff to send additional money, represented that Plaintiff was getting over $1,000,000.00 interest in the wine inventory as part of his purchase of Apicius Ristorante e Enoteca, LLC (d/b/a Bar Italia, and included two spreadsheets which purported to support said Defendants' use of Plaintiff Oswald's money. **[Exhibits 12A, 12B, 12C, 12D.]**

56.    On December 5, 2011, based on the foregoing representations of Defendants, and each of them, Plaintiff Oswald wire transferred $100,000.00 from his account at UBS in Virginia to the account of Defendant Tate Holding, Inc., at Wells Fargo Bank. **[4th Tate transfer.]**

57.    On December 19, 2011, Defendants, and each of them, instructed Plaintiff Oswald to send them additional money for Bar Italia, LLC.

58.    On December 22, 2011, based on the foregoing representations of Defendants, and each of them, Plaintiff Oswald transferred $50,000.00 from his UBS account in Virginia to the account of Defendant Tate Holding, Inc., at Wells Fargo bank. **[5th Tate transfer.]**

59.    On January 20, 2012, Defendants, and each of them, sent Plaintiff Oswald two spreadsheets. The first spreadsheet, entitled WSAInv.xls, purported to update the spreadsheet previously sent by said Defendants to Plaintiff Oswald on November 9, 2011, and referenced above in **Exhibits 10A, 10B.** WSAInv.xls included the remaining bottle count and value as of January 20, 2011, the bottle count and value on September 13, 2011, the original bottle count and cost and revenue, cost of goods sold, and profit, from purported sales on September 12, 2011, and on January 19, 2012. **[Exhibit 13A, 13B.]** The second spreadsheet, entitled Pro Forma Wine

Stock America WSA2.xls, included purported costs of wine inventories, and profit from the January 19, 2012 sale of wine. **[Exhibit 13C.]** Further, said Defendants represented that the person that purchased the wine on January 19, 2012, would pay for said wine within 60 days from February 2, 2102. **[Exhibit 13D.]**

60.    On February 2, 2012, Defendants, and each of them, instructed Plaintiff Oswald to send additional money for the wholesale wine venture. Plaintiff Oswald advised Defendant Balestrieri that Plaintiff Oswald would send wire instructions to said Defendant so that said Defendant could wire to Plaintiff Oswald his portion of the proceeds of the sale of Apicius Ristorante e Enoteca, LLC. **[Exhibit 14.]**

61.    Throughout the period of January through March, 2012, Defendants, and each of them, represented to Plaintiff Oswald that the sale of Apicius Ristorante e Enoteca, LLC, had been completed, and the proceeds from the sale had been deposited into the account of Tate Holding, Inc., at Wells Fargo Bank.

62.    Defendants, and each of them, promised and represented that Plaintiff would be paid Fifty Percent (50%) of the One Million Five Hundred and 00/100 dollars ($1,500,000.00) proceeds of the sale, as soon as the money was available.

63.    Despite the foregoing representations to Plaintiff Oswald by defendants, and each of them, there never was a sale of Apicius to Silvestri and to LSMS, there never was a payment of One Million Five Hundred Thousand and 00/100 dollars ($1,500,000.00) for the purchase of the restaurant, and there never was an intention to pay plaintiff John Oswald.

64.    Defendants, and each of them, concealed the foregoing fraud by representing that they could not pay Plaintiff Oswald the amounts due and owing to him from the sale of Apicius

to Silvestri and LSMS because the transfer of funds by the purchaser was being held-up due to a legal dispute in probate court over the ownership of those funds.

65.     On or about March 21, 2012, Defendants, and each of them, represented to Plaintiff Oswald that an attorney, Frank Roccoa, was representing Defendants Balestrieri and Sheehan in connection with obtaining the money from the sale of Apicius. [Exhibit 15]

66.     As there was no sale to Silvestri and LSMS, there was no legal dispute about non-existent funds.

67.     Beginning at least on or before March 22, 2012, Defendant Balestrieri represented to Plaintiff Oswald that he would lease premises located at 101 Old Riverhead Road, Westhampton Beach, New York, which housed a bar and restaurant, close said bar and restaurant, renovate the premises at a nominal cost, and open Buckheads Saloon in a short period of time.  Said Defendant thereafter stated that he would sell this restaurant business, at a substantial profit, and pay Plaintiff Oswald a portion of the proceeds.

68.     In reliance upon these representations, and prior and subsequent representations of the Defendants, and each of them, Plaintiff Oswald agreed to participate in the Buckheads Saloon project. Buckheads Saloon, LLC, and its predecessors, were formed by Defendants between March 22, 2012, and May 15, 2012.

69.     On April 3, 2012, Plaintiff Oswald received a copy of an email from the attorney Frank Roccoa to Defendant Sheehan, which stated *inter alia* that a court hearing regarding the proceeds from the sale of Apicius Ristorante e Enoteca, LLC, would take place the next day; that the restaurant deal was secure; and, that Defendants Balestrieri and Sheehan would have the money within the next few days. [Exhibit 16]

70.     On April 19, 2012, Plaintiff Oswald received two email communications from Defendants, and each of them, purportedly from attorney Frank Roccoa to Defendant Sheehan. These emails stated *inter alia* that he was in court in Jacksonville, Florida, the entire day and would telephone Defendants Balestrieri and Sheehan the next day at 10:00 AM. **[Exhibits 17A, 17B.]**

71.     On April 19, 2012, not knowing of Defendant's fraudulent scheme, Plaintiff Oswald sent an email communication to attorney Frank Roccoa, using the email address supplied by Defendants, and each of them. **[Exhibit 18]**

72.     On April 20, 2012, Defendants, and each of them, sent an email communication to Plaintiff Oswald, which was purportedly from attorney Frank Roccoa to Defendant Sheehan. Said email stated, inter alia, that if the money was not transferred this day, he would immediately begin legal proceedings and seek penalties for the delay. **[Exhibit 19]**

73.     The person represented to be Frank Roccoa, attorney, does not exist. He was invented by defendants, and each of them, who wrote the emails, Exhibits 15, 16, 17A, 17B, and 19. The information contained in said emails was false and was intended to further compound and conceal the previous fraudulent conduct and to further defraud plaintiff John Oswald.

74.     Thereafter, Plaintiff Oswald was told by Defendants, and each of them, that the proceeds of the sale had been transferred into the bank account of Defendant Tate Holding, Inc. at Wells Fargo Bank and the bank could not release the funds in this account because the U. S. Department of Treasury, Internal Revenue Service (hereinafter "IRS"), had obtained an income tax lien against Defendant Balestrieri and that the IRS would not permit the bank to release the funds because the IRS believed that Defendant Balestrieri was the actual owner of the Defendant Tate Holding, Inc., bank account.

75.     On or about May 4, 2012, and again on or about May 14, 2012, Plaintiff Oswald received copies of separate email messages from Defendants, and each of them purportedly from a person identified as Ghazala Ahmed, an employee of Wells Fargo Bank's East Coast Division Headquarters, located at One Wells Fargo Center, 301 South College Street, Charlotte, North Carolina.

76.     The May 4, 2012 email message represented *inter alia* that:

a.     Defendant Sheehan and her unnamed accountant had talked to Ahmed;

b.     The Wells Fargo Bank legal department was working to resolve the hold on the Defendant Tate account;

c.     Defendant Balestrieri was only a cardholder on the Tate Holding, Inc. account and had no ownership interest in the account;

d.     Everything would be resolved by early next week. **[Exhibit 20.]**

77.     The May 14, 2012 email message represented *inter alia* that:

a.     The Wells Fargo legal department sent documentation to the IRS showing that accounts in the name of Defendant Tate Holding, Inc. are solely in the name of Defendant Sheehan;

b.     Defendant Balestrieri is only an authorized signer on the account;

c.     The matter would be resolved in the next few days. **[Exhibit 21.]**

78.     On May 17, 2012, Defendant Balestrieri sent to Plaintiff Oswald an email message which stated *inter alia* that:

a.     Wells Fargo would release the funds;

b.      Ahmed had contacted Defendant Sheehan on May 17, 2012 to tell her that

the IRS had given a verbal confirmation that a release was being sent to the bank;

and,

c.      The bank would release the funds as soon as it received the IRS release.

[Exhibit 22]

79.      The person represented to be Ghazala Ahmed, an employee of Wells Fargo Bank,

does not exist.  Ahmed was invented by defendants, and each of them, who wrote the emails,

Exhibits 20, 21, and 22.  The information contained in said emails was false and was intended to

further conceal and compound the previous frauds and to further defraud plaintiff John Oswald.

80.      On May 17, 2012, Defendant Balestrieri caused a lease agreement for the

Buckheads property in Westhampton Beach to be sent to Plaintiff Oswald in Virginia for his

signature. Defendant Balestrieri told Plaintiff Oswald to sign four copies of the lease and return

them to a lawyer in Hauppauge, New York, which Plaintiff Oswald did. [Exhibits 23A, 23B.]

81.      Based on the representations of Defendants, and each of them,  and based on the

lease agreement for Buckheads, on  May 21, 2012, Plaintiff Oswald transferred by wire $84,000,

from his account at in Virginia for the deposit on the rental of the Buckheads premises.  [1st

Buckheads transfer.]

82.      On May 21-22, 2012, based on the representations of Defendants, and each of

them, Plaintiff Oswald executed the Operating Agreement Of Buckheads Saloon, LLC, and the

related corporate and financial records, and thereby became the sole owner and member of

Buckheads Saloon, LLC.  [Exhibits 23C, 23D, 23E, 23F, 23G.]

83.      On or about June 6, 2012, Plaintiff Oswald received a copy of an email

communication  from David McManis, Revenue Officer, purportedly from an employee of the

United States Department of Treasury, Internal Revenue Service, to Defendant Sheehan which

stated *inter alia*:

      a.      Apicius had been sold;

      b.      Funds from the sale had, in fact, been put into an account in the name of

Defendant Tate Holding, Inc. and were under the control Defendant Balestrieri;

      c.      The IRS was continuing to process the "potential wrongful levy" which it

had obtained on the Defendant Tate account;

      d.      The IRS had received all substantiation to establish ownership of the

Defendant Tate Holding, Inc. account;

      e.      Wells Fargo was instructed to hold the funds in the Defendant Tate

Holding, Inc. account for 5 business days starting on June 5, 2012, until June 12,

2012;

      f.      The IRS would notify Defendant Sheehan if it decided to release its levy

on the Defendant Tate account.

**[Exhibit 24.]**

84.      The person represented to be David McManis, an IRS Revenue Officer, does not

exist. He was invented by Defendants, and each of them, who wrote the email communication,

Exhibit 24. The information contained in the email communication was false and was intended

to further compound and conceal the previous frauds and to further defraud plaintiff John

Oswald.

85.      On or before June 14, 2012, a checking account at Chase Bank and an American

Express charge account were opened for Buckheads Saloon, LLC. Defendant Balistieri was

given signature authority to write checks solely on behalf of Buckheads, to use a debit card to

withdraw funds and charge purchases solely on behalf of Buckheads, and to use the American

Express card to charge purchases solely on behalf of Buckheads. Plaintiff Oswald deposited

$500 as an initial funding of said Chase account.

86.     On June 14, 2012, Defendant Balestrieri sent an email communication to Plaintiff

Oswald which stated that said Defendant was waiting to be contacted by the IRS, informed

Plaintiff of the status to construction at the Buckheads premises, assured Plaintiff that Buckheads

should be open in 3 weeks, and instructed Plaintiff to send the American Express charge card to

him at an address in West Hampton Beach, N.Y., 11978. **[Exhibit 25A, 25B.]**

87.     On or before June 6, 2012, Defendants represented that an accountant in Florida,

Wayne Cahill, was assisting the Defendants, and each of them, in resolving the purported lien that

the IRS had placed on the account of Defendant Tate Holding, Inc. at Wells Fargo Bank. **[Exhibit**

**26A.]** Between July 6, 2012, and December 28, 2012, Plaintiff received copies of multiple emails

from a Wayne Cahill These email messages stated *inter alia* that:

     a.    Cahill was working with McManis, the revenue agent, and was having

     many telephone communications with the agent;

     b.    The revenue agent had assured Cahill that there was no danger of the funds

     being seized by the IRS;

     d.    The IRS was conducting an investigation of ownership of the Defendant

     Tate Holding, Inc. account because it believed that Defendant Balestrieri owned

     the account and that all of the accounts of Defen*dant Bales*trieri had been frozen;

     e.    The IRS had received documentation that the funds did not belong to

     Defendant Balestrieri;

f.      The IRS would close their investigation because it had concluded Defendant Balestrieri did not own the account;

g.      The funds in the account would be released by the end of July, 2012;

h.      The revenue agent had told Cahill that the lien release had been finalized, entered into the system, and sent to Wells Fargo;

i.      Wells Fargo requested notarized waivers from Defendant Balestrieri and from the revenue agent in charge of the case, and Cahill had sent said waivers to Defendant Balestrieri and the agent for their signatures;

j.      Cahill was communicating with the IRS revenue agent to obtain the signed waiver;

k.      Cahill had received the waiver from the IRS revenue agent and had sent it by overnight FedEx delivery to Wells Fargo;

l.      Cahill was communicating with Wells Fargo to process the waiver paperwork and release funds to Plaintiff Oswald;

m.      Wells Fargo would release and wire transfer the funds to Plaintiff Oswald's account at UBS in Vienna, Virginia, by specific dates and times;

n.      Wells Fargo would wire transfer $3,030,000 to Plaintiff Oswald's account at UBS in Vienna, Virginia by the afternoon of September 13, 2012; (this makes no sense. Why would John get $3m when the sales price was $1.5m?)

o.      Cahill was protecting Defendant Sheehan's position because Defendant Sheehan was Cahill's client;

p. Cahill would send to Wells Fargo documentation from Cahill's tax filings, which Cahill had made on behalf of Defendant Tate Holding, Inc.

**[Exhibits 26A, 26B, 26C, 26D, 26E, 26F, 26G, 26H, 26I, 26J, 26K, 26L.]**

88.     The person represented to be Wayne Cahill, accountant, does not exist. He was invented by defendants, and each of them who wrote and sent over 30 of these email communications to Plaintiff Oswald, Exhibits 26 A through 26L. The information contained in said emails was false and was intended to further compound and conceal the previous frauds and to further defraud plaintiff John Oswald.

89.     On June 14, 2012 and July 5, 2012, Plaintiff Oswald paid $500.00 and $750.00, respectively, in connection with the aforementioned American Express account. [2nd and 3rd **Buckheads transfers.]**

90.     On July 6, 2012, Defendant Balestrieri sent to Plaintiff Oswald an email communication in which said Defendant stated that his funds were exhausted until he and Plaintiff Oswald got their money back from the IRS, and said Defendant needed money to finish the renovations to the Buckheads premises, and attached a spreadsheet of expenses. **[Exhibits 26A, 27.]**

91.     On July 7, 2012, Plaintiff Oswald received an email communication purportedly from "Wayne Cahill, which acknowledged that Plaintiff Oswald was a lender of Tate Holding, Inc., and represented that Cahill had been working with the revenue agent who assured Cahill there was no danger that the money would be seized. **[Exhibit 26B.]**

92.     On July 9, 2012, Defendants Balestrieri caused Plaintiff Oswald to transfer by wire $50,000 from his UBS account in Virginia to Buckheads Saloon, LLC, account at Chase bank. [4th **Buckheads Contribution]**

93.     On July 16, 2012, Plaintiff Oswald received an email purportedly from "Wayne Cahill" which stated he had been told by the investigator that the IRS investigation was being closed and that Defendant Balestrieri had been "cleared" of all affiliation with Tate Holding, Inc., and that the money would be release by the end of July, 2012. **[Exhibit 26D.]**

94.     On July 25, 2012, Defendant Balestrieri caused Plaintiff Oswald to transfer by wire $50,000 from his UBS account in Virginia to Buckheads Saloon, LLC, account at Chase bank. **[5th Buckheads Contribution]**

95.     On August 9, 2012, Defendants, and each of them, sent Plaintiff Oswald an email communication in which Defendant Sheehan represented that she had a telephone conversation with Ms. Ahmed of Wells Fargo bank and that Ms. Ahmed had received certain documents that said Defendant had signed and the money would be released. **[Exhibit 28.]**

96.     On or before August 13, 2012, Defendant Balestrieri represented that Joseph Scarpelli and the Scarpelli Group, LLC, a New York Limited Liability Company, offered to purchase the Buckheads Saloon, LLC, business, including the lease, for $900,000, and represented that Mr. Scarpelli would execute a  Purchase Agreement for Buckheads Saloon, LLC [Hereinafter, the "Buckheads Purchase Agreement".],

97.     Defendant Balestrieri, during the period between August 13, 2012 and January 16, 2013, repeatedly represented to Plaintiff Oswald that Joseph Scarpelli and the Scarpelli Group, LLC, would purchase Buckheads Saloon, LLC, including the lease; and thus, more money was needed from Plaintiff Oswald to continue with the renovations in order to complete this purported sale.

98.     On August 27, 2012, Plaintiff Oswald received an email communication from Defendants Balestrieri, including a spreadsheet, in which said Defendant requested additional

money for Buckheads as soon as Wells Fargo releases the proceeds from the purported sale of Apicius Ristorante e Enoteca, LLC. [Exhibit 29A, 29B.]

99.    On August 27, 2012, Defendant Balestrieri sent Plaintiff Oswald an email communication with an attached Purchase Agreement in which the Scarpelli Group, LLC, a New York limited liability company, would purchase Buckheads 100% of Buckheads Saloon, LLC, for $900,000.00. [Exhibit 30A, 30B.]

100.    On August 28 and 30, 2912, Plaintiff Oswald received email messages purportedly from "Wayne Cahill" which, stated, *inter alia*, that Wells Fargo asked for notarized waivers from Defendant Balestrieri and the revenue agent before the bank would release the funds, which Cahill claimed to have sent. [Exhibits 26G, 31.]

101.    On August 29, 2012, and September 4, 2012, Defendant Balestrieri, in multiple email communications, represented that he needed additional funds immediately or the Buckheads sale would be jeopardized. [Exhibit 32A, 32B, 32C.]

102.    On September 4, 2012, based upon the previously described representations of Defendants, and each of them, , Plaintiff Oswald transferred, by wire, $50,000 from his UBS account in Virginia to Buckheads Saloon, LLC's account at Chase bank. [6ᵗʰ Buckheads Contribution]

103.    On September 13, 2012, Defendants, and each of them, caused multiple emails to be sent to Plaintiff from "Wayne Cahill", one of which represented, inter alia, that a wire transfer of $3,030.000.00 would be sent to the Tate Holding, Inc., account at Wells Fargo bank. [Exhibit 26H.]

104.    On September 28, 2012, based upon the previously described representations of Defendanst Balestrieri and Sheehan, and each of them, Plaintiff Oswald transferred, by wire,

$51,000 from his UBS account in Virginia to Buckheads Saloon, LLC's account at Chase bank. [7th Buckheads Contribution]

105.    On October 23, 2012, Defendant Balestrieri, advised Plaintiff Oswald that, because the sale of Buckheads would close within 30 days, additional funds were required to complete the renovations.

106.    On October 25, 2012, based on Defendant Balestrieri's aforementioned representations, and other representations by Defendants, and each of them, Plaintiff Oswald transferred by wire $50,000.00 from his UBS account in Virginia to Buckheads Saloon, LLC's account at Chase Bank. [8th Buckheads Contribution]

107.    On November 8, 2012, based on the foregoing representation of defendants, and each of them,  Plaintiff Oswald transferred by wire $29,500.00 from his BB&T account in Virginia to Buckheads Saloon, LLC's, account at Chase Bank. [9th Buckheads Contribution].

108.    Prior to November 29, 2012, Defendant Balestrieri forged Plaintiff Oswald's signature and used Plaintiff Oswald's Social Security Number without permission on a credit application at Speonk Lumber Corportation, in Speonk, New York. During this period of time, Defendant Balestrieri charged $39,117.75 and failed to pay said amount. Plaintiff Oswald paid the outstanding balance. [Exhibit 33.]

109.    During this period, Defendants continually assured Plaintiff Oswald that the sale of Buckheads would be completed.

110.    On January 16, 2013, based on the foregoing representations of defendants, and each of them, Plaintiff Oswald transferred by wire $11,703.00 from his UBS account in Virginia to Buckheads Saloon, LLC's account at Chase Bank in order to complete the renovations.  [10th Buckheads transfer.]

111.    The sale to the Scarpelli Group, LLC, a New York Limited Liability Company was never completed, the Scarpelli Group, LLC, a New York limited liability company, does not exist. Defendants, and each of them, converted a substantial portion of Plaintiff's money for their personal use.

112.    Beginning with the Suite 225 transaction, and continuing through and including the Bar Italia, and the wholesale wine venture, and continuing through the Buckheads Saloon transaction, Defendants, and each of them, converted the monies invested by Plaintiff Oswald for their personal use, did not use the monies as they had represented they would; and to the extent any of said monies were used to purchase renovation materials or restaurant equipment, all of said materials and equipment have dissappeared. Instead, Defendants, and each of them, embezzled those funds in violation of the Code of Virginia, §18.2-111, Florida Statutes, § 812.014, and New York Penal Code §155.40.

113.    The fraudulent schemes defendants, and each of them, employed to obtained those funds utilized multiple telephone calls, emails and other wire communications to Plaintiff Oswald in Virginia in violation of the Federal Wire Fraud Statute, 18 U.S.C. §1343.

114.    The proposed sale of Apicius was a scheme to obtain monies from Plaintiff Oswald in Virginia.

115.    At the time that Defendants, and each of them, proposed the sale, they had no intention of paying Plaintiff any of the proceeds from the sale.

116.    At the time the Defendants, and each of them, made the representations about the aforementioned transactions, they had devised a scheme and artifice the objectives of which were to deprive Plaintiff Oswald of the money he had invested and the proceeds of said investments, to which he was entitled; and to obtain more money from Plaintiff.

117.    In furtherance of said objectives, Defendants, and each of them, represented that they were dealing with an Internal Revenue agent named "David McManis". In fact, Defendants, and each of them, invented "David McManis" or they employed someone to pretend to be "David McManis". In doing these acts, Defendants, and each of them, violated 18 U.S.C. § 912, False Personation of an employee of the United States.

118.    In furtherance of said objectives, Defendants, and each of them, represented that they were dealing with a Wells Fargo Bank employee named "Ghazela Ahmed". In fact, Defendants, and each of them, invented "Ghazela Ahmed" or they employed someone to pretend to be "Ghazela Ahmed". In doing these acts, Defendants, and each of them, violated Florida Statute § 817.02, obtaining property by false personation, and Code of Virginia, 1950, as amended § 18.2-186, false statements to obtain property or credit.

119.    In furtherance of said objectives, Defendants, and each of them, represented that they were dealing with an accountant named "Wayne Cahill". In fact, Defendants, and each of them, invented "Wayne Cahill" or they employed someone to pretend to be "Wayne Cahill". In doing these acts, Defendants, and each of them, violated Florida Statute § 817.02, obtaining property by false personation and Code of Virginia, 1950, as amended § 18.2-186, false statements to obtain property or credit.

120.    In furtherance of said objectives, Defendants, and each of them, represented that they were dealing with an attorney named "Frank Rocco". In fact, Defendants, and each of them, invented "Frank Rocco" or they employed someone to pretend to be "Frank Rocco". In doing these acts, Defendants, and each of them, violated Florida Statute § 817.02, obtaining property by false personation, and Code of Virginia, 1950, as amended § 18.2-186, false statements to obtain property or credit.

121. In or about March, 2013, Defendant Balestrieri advised Plaintiff John Oswald that the sale of Apicius and the payment of $1,500,000.00 was a fraud. Defendant Balestrieri also stated that the elaborate scheme related to claimed the seizure of the payment was entirely fabricated.

122. Thereafter, Plaintiff John Oswald discovered that the funds he had provided as described herein had been embezzled, misappropriated and stolen by defendants, and each of them.

123. As a result of the actions of defendants, and each of them, plaintiff suffered loss the monies he invested in the amount of $987,953.00.

124. As a result of the actions of Defendants, and each of them, Plaintiff Oswald expended and invested substantial time and efforts to his detriment in the amount of $1,000,000.00.

125. As a result of the actions of Defendants, and each of them, suffered embarrassment, inconvenience, anxiety, mental anguish and other harm to his physical and mental well-being.

126. As a further result of the actions of defendants, and each of them, Plaintiff Oswald lost the anticipated profits from the operation of Suite 225, Apicius, Bar Italia, and Buckheads Saloon; and from the wholesale wine venture, in the amount of $4,000,000.00.

127. As a further result of the actions of defendants, and each of them, Plaintiff Oswald lost his share from the sale of Apicius,/Bar Italia, in the amount of $750,000.00.

128. As a further result of the actions of defendants, and each of them, Plaintiff Oswald lost his interest in Suite 225, Apicius, Bar Italia, the wine, and Buckheads, all to his detriment in the amount of $4,000,000.00.

129.     As a further result of the actions of defendants, and each of them, Plaintiff Oswald lost his interest in the wine venture in the amount of $500,000.00.

130.     As a result of the actions of defendants, and each of them, plaintiff was required to and will be required to incur legal and other expenses, including but not limited to attorneys' fees, court reporter fees and other costs.

## FIRST CAUSE OF ACTION
## FRAUD (AMERICAN PIE, LLC, AND SUITE 225)

131.     Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba.*

132.     At the time defendants, and each of them, induced Plaintiff Oswald to contribute money to American Pie, LLC, or obtained, or retained, Plaintiff Oswald's money, defendants, and each of them, knew that they had no intention to use Plaintiff's monies to purchase and improve Suite 225 or to pay Plaintiff Oswald the monies that were or would be due and owing to him.

133.     Instead, Defendants, and each of them, knew that they did or would embezzle for their own purposes the monies that Plaintiff would contribute..

134.     Defendants, and each of them, told Plaintiff Oswald that they would use his monies for the purchase and renovation of Suite 225 with the intent that Plaintiff Oswald would rely on said representations.

135.     Plaintiff reasonably relied on said representations and provided the monies and efforts described herein.

136.     As a result of the conduct of Defendants, and each of them, Plaintiff Oswald suffered the damages or losses herein described at paragraphs 123 through 130, inclusive.

137.     In doing the things alleged herein, Defendants, and each of them, acted willingly, intentionally, maliciously, and/or fraudulently, justifying the award of punitive damages.

WHEREFORE, on the First Cause of Action, Plaintiff prays judgment against defendants, and each of them, as follows:

a. Specific damages in the amount of One Million dollars ($1,000,000.00) or according to proof;

b. General damages in the amount of Three Million dollars ($3,000,000.00) or according to proof;

c. Punitive damages in the amount of Five Million dollars ($5,000,000.00);

d. Interest at the legal rate;

e. Costs of suit herein; and/or

f. Such other and further relief as the Court may deem just and proper.

## SECOND CAUSE OF ACTION
### FRAUD (TATE HOLDING, INC., BAR ITALIA, LLC, THE WINE, AND APICIUS RISTORANTE E ENOTECA, LLC)

138.    Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth in haec verba.

139.    At the time defendants, and each of them, induced Plaintiff Oswald to purchase 50% of Tate Holding, Inc., shares in Apicius Ristorante E Enoteca, LLC, and to purchase a 50% interest in the wine, defendants, and each of them, knew that they had no intention to allow Plaintiff to have any interest in either entity or any interest in the proceeds of any sale of wine or Apicius Ristorante E Enoteca, LLC.

140.    Instead, Defendants, and each of them, knew that they would embezzle, for their own purposes, the monies that Plaintiff did and would contribute, and did not and would not allow plaintiff access to any assets of these companies or tot the proceeds of any sale of wine or Apicius Ristorante E Enoteca, LLC.

141.    Defendants, and each of them, told Plaintiff Oswald that that he would have a 50% interest in Tate Holding, Inc., shares in Apicius Ristorante E Enoteca, LLC, and a 50% interest in the wine, with the intent that Plaintiff Oswald would rely on said representations.

142. Plaintiff reasonably relied on said representations and provided the monies and efforts described herein.

143. Instead, Defendants, and each of them, knew that they did and would embezzle for their own purposes the monies that Plaintiff would contribute.

144. As a result of the conduct of Defendants, and each of them, Plaintiff Oswald suffered the damages or losses herein described at paragraphs 123 through 130, inclusive.

145. In doing the things alleged herein, defendants, and each of them, acted willingly, intentionally, maliciously, and/or fraudulently, justifying the award of punitive damages.

WHEREFORE, on the Second Cause of Action, Plaintiff prays judgment against defendants, and each of them, as follows:

a. Specific damages in the amount of One Million dollars ($1,000,000.00) or according to proof;

b. General damages in the amount of Three Million dollars ($3,000,000.00) or according to proof;_

c. Punitive damages in the amount of Five Million dollars ($5,000,000.00);

d interest at the legal rate;

e. Costs of suit herein; and/or

f. Such other and further relief as the Court may deem just and proper.

### THIRD CAUSE OF ACTION
### FRAUD (FAKE PEOPLE)

146. Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba*.

147. At the time defendants, and each of them, sent the emails and other communications a) from "David McManis; b) from "Ghazale Ahmed; c) from "Wayne Cahill; and/or d) from "Frank Rocco", defendants and each of them, knew that these people, and each of them, were fabricated and that the information in said communications was false.

148.  Defendants, and each of them, sent these emails with the intent that Plaintiff Oswald would rely on the authority and/or expertise of these fabricated people and the false representations in those emails.

149.  Plaintiff reasonably relied on said authority and/or expertise and he relied on representations and provided the monies and efforts described herein and failed to act to protect himself.

150.  As a result of the conduct of Defendants, and each of them, Plaintiff Oswald suffered the damages or losses herein described at paragraphs 123 through 130, inclusive.

151.  In doing the things alleged herein, defendants, and each of them, acted willingly, intentionally, maliciously, and/or fraudulently, justifying the award of punitive damages.

WHEREFORE, on the Fifth Cause of Action, Plaintiff prays judgment against defendants, and each of them, as follows:

a.  Specific damages in the amount of One Million dollars ($1,000,000.00) or according to proof;

b.  General damages in the amount of Three Million dollars ($3,000,000.00) or according to proof;

c.  Punitive damages in the amount of Five Million dollars ($5,000,000.00).;

d.  Interest at the legal rate;

e.  Costs of suit herein; and/or

f.  Such other and further relief as the Court may deem just and proper.

## FOURTH CAUSE OF ACTION
## FRAUD (BUCKHEADS SALOON, LLC AND BUCKHEADS)

152.  Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba*.

153.  At the time defendants, and each of them, told Plaintiff Oswald that they would renovate the premises in Westhampton Beach, New York; that they would open a restaurant in

that space to be called Buckheads Grill or Buckheads Saloon; that they would sell this business including the lease; that they would recover the losses on the other transactions described infra, and that they would repay Plaintiff all monies due and owing to him, they knew said representations were false.

154.    At the time defendants, and each of them, induced Plaintiff Oswald to send additional money for the Buckheads transaction, defendants, and each of them, knew that they had no intention to complete the sale of Buckheads or repay Plaintiff Oswald the monies due and owing to him.

155.    Instead, Defendants, and each of them, knew that they did and would embezzle for their own purposes the monies that Plaintiff would contribute.

156.    Plaintiff reasonably relied on said representations and provided the monies and efforts described herein. As a result of the conduct of Defendants, and each of them, Plaintiff Oswald suffered the damages or losses herein described at paragraphs 123 through 130, inclusive.

157.    In doing the things alleged herein, defendants, and each of them, acted willingly, intentionally, maliciously, and/or fraudulently, justifying the award of punitive damages.

WHEREFORE, on the Fourth Cause of Action, Plaintiff prays judgment against defendants, and each of them, as follows:

a. Specific damages in the amount of One Million dollars ($1,000,000.00) or according to proof;

b. General damages in the amount of Three Million dollars ($3,000,000.00)or according to proof;

c. Punitive damages in the amount of Five Million dollars ($5,000,000.00).

d. Interest at the legal rate.

e. Costs of suit herein; and/or

f. Such other and further relief as the Court may deem just and proper.

## FIFTH CAUSE OF ACTION
## RICO (18 U.S.C. § 1961 ET SEQ.)

158.    Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba.*

159.    Defendants, and each of them, are enterprises, which separately and together engaged in racketeering activity.

160.    Said racketeering activity included fraudulently forming entities, fraudulently pretending to selling entities and portions of entities, fraudulently obtaining monies from Plaintiff, fraudulently inventing a government/IRS agent, an accountant, an attorney and a bank official to obtain monies from Plaintiff, knowingly and intentionally embezzling and stealing monies and doing the other activities described herein.

161.    Defendants, and each of them, directly engaged in this enterprise and this enterprise was an enterprise affecting interstate commerce.

162.    In order to perpetuate the racketeering activity described herein, defendants, and each of them, committed wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341.

163.    As a result of the conduct of Defendants, and each of them, Plaintiff Oswald suffered the damages or losses herein described in paragraphs 123 through 130, inclusive.

WHEREFORE, on the Fifth Cause of Action, Plaintiff prays judgment against defendants, and each of them, as follows:

a. Specific Damages in the amount of Three Million dollars ($3,000,000.00) or according to proof;

b. General Damages in the amount of Five Million dollars ($5,000,000.00) or according to proof;

c. Reasonable attorneys' fees as authorized by statute according to proof;

d. Treble damages as authorized by statute;

e. Interest at the legal rate;

f. Costs of suit herein; and/or

g. Such other and further relief as the Court may deem just and proper.

### SIXTH CAUSE OF ACTION
### BREACH OF CONTRACT (AMERICAN PIE OPERATING AGREEMENT)

164.    Plaintiff Oswald incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba.*

165.    In doing the things herein alleged, defendants, and each of them, breached the American Pie Operating Agreement.

166.    As a result of said breach, Plaintiff Oswald suffered the loss of his investment of Three Hundred Twenty Five Thousand dollars ($325,000.00) and the loss of anticipated profits in the amount of Four Million dollars ($4,000,000.00);

WHEREFORE, on the Sixth Cause of Action, plaintiff prays judgment against defendants, and each of them, as follows:

a. Loss of his investment in American Pie, LLC of Three Hundred Twenty Five Thousand dollars ($325,000.00);

b. Loss of profits in the amount of Four Million dollars ($4,000,000.00);

b. interest at the legal rate;

c. Costs of suit herein; and/or

d. Such other and further relief as the Court may deem just and proper.

### SEVENTH CAUSE OF ACTION
### BREACH OF CONTRACT (TATE HOLDING, INC., SALE)

167.    Plaintiff Oswald incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba.*

168.    In doing the things herein alleged, defendants, and each of them, breached the agreement to sell 50% of Tate Holding, Inc., shares in Apicius Ristorante E Enoteca, LLC, to Plaintiff Oswald.

169.    As a result of said breach, Plaintiff Oswald suffered the loss of his investment of Five Hundred Thousand dollars ($500,000.00) and the loss of anticipated profits in the amount of Two Million Four Hundred Thousand dollars ($2,400,000.00);

WHEREFORE, on the Seventh Cause of Action, plaintiff prays judgment against defendants, and each of them, as follows:

a. Loss of his investment in Tate Holding, Inc. of Five Hundred Thousand dollars ($500,000.00).

b. Loss of profits in the amount of Two Million Four Hundred Thousand dollars ($2,400,000.00);

b. interest at the legal rate

c. Costs of suit herein; and/or

d. Such other and further relief as the Court may deem just and proper.

## EIGHTH CAUSE OF ACTION
## BREACH OF CONTRACT (BUCKHEAD OPERATING AGREEMENT)

170.    Plaintiff Oswald incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba.*

171.    In doing the things herein alleged, defendants, and each of them, breached the Buckhead Operating Agreement.

172.    As a result of said breach, Plaintiff Oswald suffered the loss of his investment of Three Hundred Seventy Seven Thousand Eight Hundred Twenty dollars ($377,823.00) and the loss of anticipated profits in the amount of Four Million dollars ($4,000,000.00).

WHEREFORE, on the Eighth Cause of Action, plaintiff prays judgment against defendants, and each of them, as follows:

a. Loss of his investment in Buckhead, LLC of Three Hundred Seventy Seven Thousand Eight Hundred Twenty dollars ($377,823.00);

b. Loss of profits in the amount of Four Million dollars ($4,000,000.00);

c. interest at the legal rate;

d. Costs of suit herein; and/or

e. Such other and further relief as the Court may deem just and proper.

## NINTH CAUSE OF ACTION
## CONVERSION

173. Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba.*

174. In doing the things alleged herein, defendants, and each of them, wrongfully and intentionally converted to their own use. the following:

a. Plaintiff's monies and efforts contributed for all transactions described herein;

b. Plaintiff's interest in American Pie, LLC;

c. Plaintiff's interest in Bar Italia, LLC;

d. Plaintiff's interest in Tate Holding, Inc.;

e. Plaintiff's interest in Apicius Ristorante E Enoteca, LLC; and

f. Plaintiff's interest in the Buckhead project.

175. As a result of the conduct of Defendants, and each of them, Plaintiff Oswald suffered the damages or losses herein described at paragraphs 123 through 130, inclusive.

176. In doing the things alleged herein, defendants, and each of them, acted willingly, intentionally, maliciously, and/or fraudulently, justifying the award of punitive damages.

WHEREFORE, on the Ninth Cause of Action, Plaintiff prays judgment against defendants, jointly and severally, as follows:

a.      For loss of One Million Five Thousand Seven Hundred Fifty dollars ($1,005,750.00) investment monies;

b.      For loss of Plaintiff's interest in American Pie, LLC, Tate Holding, Inc., Apicius Ristorante e Enteca, LLC, Bar Italia, LLC, and the Buckhead project in the amount of Ten Million Dollars ($10,000,000.00).

c.      General damages in the amount of Three Million Dollars  ($3,000,000.00 or according to proof;

d.      Punitive damages in the amount of Five Million dollars ($5,000,000.00), or according to proof;

e.      Attorneys' fees according to proof;

f.      Interest;

g.      Costs of suit herein;

h.      Such other and further relief as the Court may deem just and proper.

### TENTH CAUSE OF ACTION
### COMBINATION TO INJURE PLAINTIFF OSWALD IN
### HIS REPUTATION, TRADE, BUSINESS, OR PROFESSION

177.   Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba.*

178.   In doing the things herein alleged, defendants, and each of them, combined, associated, agreed, mutually undertook or concerted together, and/or with each other; and attempted to or did procure the participation, cooperation, agreement or other assistance of one

or more persons to enter into their combination, association, agreement, mutual understanding or concert.

179.   The purposes of said combinations, associations, agreements, mutual undertakings or concerts; or attempts or actual procurement of the participation, cooperation, agreement or other assistance of one or more persons to enter into the said combination, association, agreement, mutual understanding or concert; was and has been for the purpose of:

a. Willfully and maliciously injuring Plaintiff in his business, or profession; or

b. Willfully and maliciously preventing Plaintiff from engaging in lawful acts of being a member, manager, or owner of American Pie, LLC, Tate Holding, Inc., Bar Italia, LLC, Apicius Ristorante E Enoteca, LLC, and Buckheads Saloon, LLC.

180.   Said purposes were accomplished by the means described herein.

181.   In doing the things alleged herein, defendants, and each of them, are liable to Plaintiff pursuant to Code of Virginia, 1950, as amended, §18.2-500.

182.   As a result of the conduct of defendants, and each of them, Plaintiff Oswald suffered the damages or losses herein described at paragraphs 123 through 130, inclusive.

183.   Additionally, Plaintiff has been and will be deprived of the profits from the businesses, loss of his investments, loss of his membership share of the proceeds.

184.   Pursuant to Code of Virginia, 1950, as amended, § 18.2-500, Plaintiff is entitled to and hereby demands "three-fold the damages" sustained by him.

WHEREFORE, on the Tenth Cause of Action, Plaintiff prays judgment against defendants, jointly and severally, as follows:

a. General personal injury and property damages in the amount of Five Million Dollars ($5,000,000.00), or according to proof;

b. Loss of profits, according to proof;

c. Loss of investment of One Million Five Thousand Seven Hundred Fifty Dollars ($1,005,750.00);

d. Three fold the amount of the foregoing damages;

e  Attorneys' fees according to proof;

f. Interest;

g. Costs of suit herein; and/or

h. Such other and further relief as the Court may deem just and proper.

## ELEVENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

185.    Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba*.

186.    In doing the things alleged herein, defendants, and each of them, acted intentionally and without legal authority.

187.    In doing the things alleged herein, defendants and each of them, knew or should have known that their conduct would cause Plaintiff Oswald emotional distress.

188.    The conduct of defendants, and each of them, as described herein was outrageous and intolerable in that it offended generally accepted standards of decency and morality.

189.    As a result of the conduct of defendants, and each of them, Plaintiff Oswald suffered severe emotional distress.

190.    As a result of the conduct of defendants, and each of them, Plaintiff Oswald suffered the damages or losses herein described at paragraphs 123 through 130, inclusive.

191.    In doing the things alleged herein, defendants, and each of them, acted willingly, intentionally, maliciously, and/or fraudulently, justifying the award of punitive damages.

WHEREFORE, on the Eleventh Cause of Action, Plaintiff prays judgment against defendants, jointly and severally, as follows:

a. General personal injury and property damages in the amount of Five Million Dollars ($5,000,000.00), or according to proof;

b. Punitive damages in the amount of One Million Dollars, or according to proof;

c. Attorneys' fees according to proof;

d. Costs of suit herein; and/or

e. Such other and further relief as the Court may deem just and proper.

## TWELFTH CAUSE OF ACTION
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

192. Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba*.

193. In doing the things alleged herein, defendants, and each of them, breached the covenant of good faith and fair dealing.

194. As a result of the conduct of Defendants, and each of them, Plaintiff Oswald suffered the damages or losses herein described at paragraphs 123 through 130, inclusive.

195. In doing the things alleged herein, defendants, and each of them, acted willingly, intentionally, maliciously, and/or fraudulently, justifying the award of punitive damages.

WHEREFORE, on the Twelfth Cause of Action, Plaintiff prays judgment against defendants, jointly and severally, as follows:

a. General personal injury and property damages in the amount of Five Million  dollars ($5,000,000.00), or according to proof;

b. Punitive damages in the amount of Four Million dollars ($4,000,000.00), or according to proof;

c. Attorneys' fees according to proof;

d. Interest;

e. Costs of suit herein; and/or

f.      Such other and further relief as the Court may deem just and proper.

### THIRTEENTH CAUSE OF ACTION
### GROSS NEGLIGENCE, WILLFUL AND
### WANTON NEGLIGENCE, NEGLIGENCE

196.    Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba.*

197.    In doing the things alleged herein, defendants and each of them, acted negligently.

198.    Additionally and/or alternatively, in doing the things herein alleged, defendants, and each of them, acted with such complete indifference to Plaintiff Oswald as to constitute an utter disregard of caution amounting to a complete neglect of the rights of plaintiff as to shock fair-minded people.  Thus, the actions of defendant, and each of them, constitute gross negligence.

199.    Additionally and/or alternatively, in doing the things herein alleged, defendants, and each of them, acted consciously in disregard of Plaintiff's rights or with reckless indifference to the consequences to Plaintiff when additionally and/or alternatively, in doing the things herein alleged, defendants, and each of them, were aware of their conduct and also were aware, from their knowledge of circumstances and conditions existing at that time, that their conduct would probably result in harm to plaintiff.

200.    As a result of the foregoing actions of Defendants, and each of them, Plaintiff Oswald suffered the damages or losses herein described at paragraphs 123 through 130, inclusive.

201. In doing the things alleged herein, defendants, and each of them acted willfully, wantonly, and intentionally and in conscious disregard of plaintiff's rights. Said conduct justifies the award of punitive damages.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, on the seventh cause of action:

a. General compensatory damages in the amount of Two Million Dollars ($2,000,000.000) or according to proof;

b. Special damages according to proof;

c. Punitive damages in the amount of Four Million Dollars ($4,000,000.00);

d. Costs of suit herein; and/or

e. Such other and/or further relief as the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
## EXPULSION AND/OR DECLARATORY RELIEF

202. Plaintiff incorporates all the allegations of the previous paragraphs as if said allegations were set forth *in haec verba.*

203. Defendants' wrongful conduct as described herein has adversely and materially affected Plaintiff's business as well as the businesses of American Pie, LLC, Tate Holding, Inc., Apicius Ristorante E Enoteca, LLC, Bar Italia, LLC and Buckheads Saloon, LLC.

204. Defendants' wrongful conduct as described herein constitute a willful and/or a persistent breach of the contractual documents related to the business activities of American Pie, LLC, Tate Holding, Inc., Apicius Ristorante E Enoteca, LLC, Bar Italia, LLC, and Buckheads Saloon, LLC.

205.    Defendants' conduct toward Plaintiff and the previously described businesses as described herein, has created a situation in which it is not reasonably practicable to carry on said business with Defendants.

206.    In doing the things herein alleged, has violated the requirements of Code of Virginia, 1950, as amended, § 13.1-1040.1(5), which requires expulsion for said conduct.

207.    In the alternative, this Court has the authority to determine the rights of the parties with regard to each of the aforementioned entities.

WHEREFORE, on the Fourteenth Cause of Action, Plaintiff prays judgment against defendants, jointly and severally as follows:

a.    Termination of defendants, and each of their memberships in and expulsion from American Pie, LLC.;

b.    Termination of defendants, and each of their memberships in and expulsion from Ristorante E Apicius Enotec, LLC;

c.    Termination of defendants, and each of their memberships in and expulsion from Bar Italia, LLC;

d.    Termination of defendants, and each of their memberships in and expulsion from Buckhead Saloon, LLC;

e.    Removal from management or any position with Tate Holding, LLC;

f.    Declaration of the rights of the parties with regard to each of the businesses and with each other;

g.    Attorneys' fees according to proof;

h.    Interest;

i.    Costs of suit herein; and/or

j.      Such other and further relief as the Court may deem just and proper.


Plaintiff hereby demands trial by jury.


Respectfully submitted,

JOHN P. OSWALD
By counsel


Counsel for Plaintiff:


Alan J. Cilman
Virginia State Bar #13066
4160 Chain Bridge Road
Fairfax, VA 22030
Telephone: (703) 385-7300
Facsimile: (703) 591-5863
acilman@aol.com

Michael L. Fayad
DC Bar #91694
1033 Union Church Road
McLean, VA  22102
Telephone: (703) 759-2972
Facsimile: (703) 759-2994
mfayad@mfayadlegal.com